IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ESTATE OF MATTHEW HOLMES,
by and through administrator, WENDY COUSER,
as administrator and individually,

        Plaintiff,

v.                                     Case No.  18-1221-JWB

CHRIS SOMERS,

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on cross motions for summary judgment and motions to exclude.  (Docs. 232, 233, 234, 238.)  The motions have been fully briefed and are ripe for decision. (Docs. 239, 247, 255, 256, 257, 265, 267, 268, 269.)  Defendant's motion for summary judgment (Doc. 232) is GRANTED, Plaintiff's motion for summary judgment (Doc. 238) is DENIED, and the motions to exclude (Docs. 233, 234) are DENIED as MOOT for the reasons stated herein.

I.     **Facts**

Plaintiff Wendy Couser brings this action on behalf of the estate of Matthew Holmes.  On August 28, 2017, Holmes was shot and killed by Defendant Chris Somers, who was a McPherson County Sheriff's Deputy at the time of the shooting.  Plaintiff asserts a claim for damages under 42 U.S.C. § 1983, alleging that Defendant's use of deadly force constituted an unreasonable seizure that deprived Holmes of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  (Doc. 171 at 9.)

On the evening of August 28, 2017, City of Newton Police Officers Hinton and Minkevitch were dispatched to a call involving an automobile burglary in Newton, Kansas.  After spotting a

vehicle matching the description, Hinton activated the siren on his patrol car and began pursuit. The vehicle being pursued was driven by Holmes and the passenger was Kenneth Herrod. During the pursuit, the vehicles reached excessive speeds. Officer Hinton testified that the speeds during the pursuit ranged from 70 to 80 miles an hour and over 100 miles an hour at times. (Doc. 259-17 at 78:9-22.)[1]  Officers deployed a "stop strip" or "spike strip" that punctured the tires on the vehicle. (*Id.* at 83:16–21; Doc. 232 at ¶ 5.)  This did not have an immediate effect on Holmes who continued to operate the vehicle after the front tires were flattened.  Based on the video evidence, dispatch reported that the vehicle's front two tires were disabled after hitting the stop strips; however, Holmes continued to drive the vehicle for approximately 14 minutes while ranging in speeds from less than 20 miles per hour to 40 miles per hour.  (Doc. 34-1, Exh. A, Minkevitch video at 5:58-20:28.)  Somers was working on the evening of August 28 and was advised by dispatch of the pursuit following a burglary call.  Somers joined the pursuit after Holmes' vehicle had been damaged by the stop strips and was slowing down.  The pursuit ultimately ended on the grass median between north and southbound traffic on Interstate I-135 in McPherson County. (Docs. 232 at 2; 265 at 15.)

After the vehicle was stopped, the officers parked around Holmes' vehicle and exited their patrol vehicles.  There were law enforcement officers from the City of Newton, Harvey County, and McPherson County present on the scene.  Somers relocated to the passenger side of Corporal Hawpe's vehicle.  Hawpe was a K-9 officer for the City of Newton and had his K-9 with him at

---

[1] Plaintiff attempts to controvert Somers' statement of fact that the pursuit reached speeds of over 100 miles per hour on the basis of Plaintiff's declaration that she does not believe Holmes' vehicle could drive over 100 miles per hour and that it would have had trouble driving at 60 miles per hour. (Doc. 259-26, Plaintiff's Decl.)  Plaintiff's declaration about her beliefs do not sufficiently controvert this fact.  In addition to the video evidence in which Hinton or Minkevitch discussed driving over 100 miles per hour, there is also deposition testimony supporting the fact that Holmes was traveling over 100 miles per hour.  (*See* Docs. 232 at 2 (citing video evidence); 259-17 at 78:9-22.)  Moreover, Plaintiff's expert's report states that the evidence supports a finding that Holmes drove in excess of 100 miles per hour during the pursuit and that it was undisputed that his actions were "reckless" and "placed the public in danger."  (Doc. 259-21 at 13.)

the scene.  Law enforcement officers were stationed at both the driver and passenger sides and the rear of Holmes' vehicle.  Immediately after Holmes stopped in the median, the sirens on Somers' patrol vehicle continued to blare for almost one minute.  (Minkevitch body cam. at 20:28-21:05; Doc. 259-1, Somers' Depo. at 87:11-19.)  After the sirens were turned off, Holmes remained in his vehicle for approximately two minutes.  (*Id.* at 21:05-23:16.)  The vehicle continued to play music and it appeared that both occupants were smoking cigarettes.  (Docs. 232-1, Herrod Depo. at 70:10-14; 232-2, Hinton Depo. at 101:2-6.)  During this two minute period, multiple law enforcement officers were giving commands to Holmes and his passenger to exit the vehicle. (Docs. 232 at 3 (citing videos and deposition testimony); 265 at 16.)  Officer Austin Sontag testified that he heard Holmes say "I'm not getting out."  (Doc. 232-7 at 60:24-25.)  Both Hinton and Sontag testified that Holmes yelled "fuck you" to the officers during the exchange.  (*Id.*; *see also* Doc. 232-2 at 100:2-5.)[2]  Hawpe and Somers were stationed on the driver's side of the vehicle but several feet away.  Hawpe also had his K-9 next to him.  Viewing Hawpe's video, over a period of approximately one and a half minutes, Hawpe and/or Somers instructed Holmes to put his hands up five times and instructed Holmes to get out of the car at least nine times.  (Doc. 259, Exh. 5, Hawpe body cam. at 1:08-2:30) (e.g., "get out of the car," "get your hands up," "Hands up, step out of the car.")  At one point, Somers yells, "keep your fucking hands up or you will get shot." (Docs. 265 at 8; 269 at 2.)  During the same time period, Minkevitch was stationed on the passenger side and his body camera reflects that he and/or other officers in close proximity instructed both occupants several times to get out of the car and put their hands where they could see them. (Minkevitch body cam. at 21:00-23:00) (e.g., "passenger get out of the car," "get out of the car,"

---

[2] Plaintiff attempts to controvert this statement by citing to the video exhibits and testimony from Hulse.  Hulse, however, did not contradict this evidence but merely testified that he did not recall if Holmes used the "f you" phrase. (Doc. 259-4 at 106:19-22.)  Further, the videos do not contradict this testimony as there are several times where it is not clear what Holmes is stating or yelling but it is clear that he is saying something to the officers.

"hands up.")  The videos also reflect that the officers were concerned with Holmes' right hand because they could not see his right hand at times because he was not complying with commands to keep his hands up.  Hawpe or Somers can be heard on the video telling another officer that Holmes was reaching out of view.  (Hawpe body cam. at 2:30.)  Somers, however, did not see a weapon in Holmes' hand.  (Doc. 232-3 at 90:12–14.)  Minkevitch, who was stationed on the passenger side of the vehicle, was also concerned with the officers' inability to see Holmes' right hand and yelled for Holmes to show his right hand.  (Minkevitch body cam. at 22:52–23:02.) Somers can be heard telling Holmes to get his hands up "or you will get shot."  (*Id.* at 2:10–11; Doc. 259, Exh. 7, Somers body cam. at 0:35–37.)[3]

After about one minute, a Newton police officer yells if anyone has any "non-lethal." (Minkevitch body cam. at 21:52–55; Doc. 232-3 at 97:16–18; 98:3–11.)  Somers then radioed Jason Achilles and asked him to bring the bean bag shotgun up.  (Doc. 232-3 at 97:20–23.)  Somers was trained in using the non-lethal bean bags.  Somers, Achilles, and Hawpe discussed using the non-lethal bean bags to break the driver's side window, which was part-way down, so that the K-9 could enter the vehicle if Holmes did not exit the vehicle.  (*Id.* at 100:8–18.)

Approximately three minutes after stopping his vehicle in the median, Holmes exited his vehicle.  Kenneth Herrod remained in the vehicle.  The following events  occurred over approximately twenty seconds after he exited the vehicle.  Holmes opened the door from the outside in order to exit his vehicle which complied with an officer's instructions immediately prior to Holmes opening the door.  (Docs. 265 at 9; 269 at 2.)  When he was climbing out of the vehicle, the video shows Holmes holding his hands slightly elevated but then he immediately puts his hands down at his side.  (Somers body cam. at 1:09–12.)  Holmes' hands remained down and he did not

---

[3] Both parties have submitted Somers' body camera video as an exhibit.  All further references to Somers' body camera video are to Plaintiff's exhibit 7 attached to Document 259 and submitted as a conventional exhibit to the court.

have a weapon in his hands.  Holmes did not put his hands inside his pants or charge towards the officers.  (Docs. 265 at 9; 269 at 2.)  Herrod testified that Holmes said "shoot me."[4]  (Doc. 232-1, Herrod Depo. at 45:16–21.)  Somers, Boese, Hawpe, and Hulse all testified that Holmes was yelling "shoot me" when he exited the vehicle.  (Docs. 232-3 at 99:20–22 (Somers); 232-4 at 98:15–19 (Hawpe); 232-8 at 93:4–7 (Boese); 232-9 at 57:16–18 (Hulse)).  Somers can be heard saying he was "going less lethal" and changed his weapon to a taser.  (Somers' body cam. at 1:09–10.)  The officers continued to shout commands at Holmes in those first five seconds upon his exit from the vehicle.[5]  The officers can be heard telling Holmes to get down on the ground at least five times.  (Somers' body cam. at 1:09–14; Hawpe's body cam. at 2:43–50.)  Somers can also be heard saying "come over" one time.  (Somers' body cam. at 1:13.)  The video evidence reflects that Holmes did not make any attempt to get on the ground nor did he move any further toward the officers.  (Hawpe's body cam. at 2:43–50.)  Holmes continued to yell at the officers as they were giving commands.  (*Id.*; *see also* 232-4 at 98:10–19 (Hawpe Depo.); 232-8 at 93:1–7 (Boese Depo.)).  Immediately after saying "come over," Somers said "hit him."  (Somers' body cam. at 1:14–15.)  Approximately five to six seconds after Holmes began his exit from the vehicle, Deputy Achilles fired two non-lethal bean bag rounds at Holmes.  Achilles testified that he used the bean bag rounds to attempt to subdue Holmes so that he could be taken into custody.  (Doc. 232-10, Achilles Depo. at 100:14–20.)  Achilles believed that it was necessary due to Holmes' actions, his statements, and because of Herrod who remained in the vehicle.  (*Id.*)  The bean bag rounds hit Holmes in his torso and Somers testified that they had no apparent effect on Holmes.  (Doc. 232-

---

[4] Plaintiff argues that this statement is disputed because it is contradicted by Herrod's prior testimony that Holmes' last words were "no, you don't got to get out of the car." (Doc. 265 at 18–19.)  Reviewing the testimony, the court does not find that it is inconsistent.  Moreover, Herrod was not the only witness to testify regarding Holmes' statements of "shoot me."  Several officers testified as such.  Further, Hawpe's body camera footage also supports this fact as Holmes appears to be repeatedly stating the word "shoot" as he is exiting the vehicle.  (Hawpe body cam. at 23:40–50.)
[5] The initial five seconds includes the time that Holmes was climbing out of the vehicle.

3, Somers Depo. at 113:2–5.)  Somers testified that an individual would typically hunch over or go to the ground after being shot by the bean bags.  (*Id.* at 113:7–16.)  Somers' body camera video shows that Holmes does appear to back up after being hit by the bean bags, angle his body towards the vehicle, and move his arms in front of his torso with his left arm crossing higher in front of his body.  (Somers' body cam. at 1:16–19.)  At about that same time,[6] Somers deployed his taser on Holmes.  Somers testified that he could not tell if the darts from his taser pierced Holmes' skin and the taser appeared to have no effect on Holmes.  (Doc. 232-3 at 115:9–19.)

Approximately three seconds after the bean bags were fired, Hawpe gave his K-9 Bella the command to bite Holmes.  (Doc. 232-4 at 111:5–10.)  The K-9 moved towards Holmes who kicked in the vicinity of the dog's head.  (Doc. 232-3 at 117:11–118:12; Somers' body cam. at 1:18–19.)  The K-9, Bella, was not struck when Holmes kicked towards the dog's head.  (Docs. 265 at 23; 269 at 14.)  Bella immediately ran off.  Somers admits that the use of a dog creates fear in people and that even officers would react to avoid being bitten by the dog.  (Docs. 265 at 4; 269 at 4.)

Hawpe and Somers both moved forward towards Holmes following the K-9.  Hawpe testified that he intended to apprehend Holmes and take him into custody since he was the closest officer to Holmes and the other non-lethal methods had failed.[7]  (Doc. 232-4 at 116:1–12.)  The video shows Hawpe holstering his weapon on his right side as he approached Holmes.  (Somers' body cam. at 1:20.)  In those next two seconds, there were two additional commands to get down

---

[6] Somers asserts that the taser was deployed after Achilles shot the bean bags at Holmes.  Plaintiff objects and asserts that the video shows that the taser was deployed prior to the bean bags.  (Doc. 265 at 21.)  Viewing the video, it appears that Somers is pulling the trigger on his taser at about the same time the bean bags hit Holmes.  (Somers' body cam. at 1:14–18.) In any event, it is not significant as to whether the taser was deployed before, at the same time, or after the bean bags were deployed.  Both events occurred in rapid succession.

[7] Plaintiff argues that Hawpe's statement that he intended to take Holmes into custody is controverted and that a jury must determine whether he approached Holmes to arrest him or in retaliation for kicking at the dog.  (Doc. 265 at 23.)  Plaintiff, however, fails to cite to any evidence that would suggest that Hawpe approached Holmes in retaliation for kicking at the dog.  Moreover, Plaintiff has dismissed her claims of excessive force against Hawpe.

given to Holmes. (*Id.* at 1:20–22.) Holmes remained standing next to his vehicle and made no moves towards the officers. (*Id.*)

When Hawpe was next to Holmes, Hawpe reached towards Holmes and grabbed Holmes by his neck. (*Id.* at 1:22; Doc. 232-4 at 119:20–120:1.) Hawpe testified that he intended to pull Holmes to the ground and place him under arrest. (Doc. 232-4 at 116:1–12; 119:20–24.) Holmes then grabbed Hawpe around his body and the two went down to the ground. (Somers' body cam. at 1:23–25; Doc 232-4 at 118:14–25; 120:3–5.) Somers testified that he was watching where the K-9 went and did not see what caused Hawpe and Holmes to fall to the ground. (Doc. 232-3 at 121:2–122:4.) Somers testified that Hawpe and Holmes appeared to be actively fighting and struggling on the ground.[8] (Doc. 259-1, Somers' Depo. at 124:16–25.) Somers testified that he tried to get on Holmes' back to assist Hawpe and subdue Holmes. (*Id.* at 126:11–18.) As they were on the ground, Holmes' left arm was wrapped around Hawpe's back, leaving his left hand by Hawpe's left waist. (Doc. 232-4 at 122:7–14.) Four seconds after Hawpe and Holmes went to the ground, Somers placed his left hand on Holmes' left wrist and his right hand on Holmes' left elbow. (Docs. 265 at 11; 269 at 4; Somers' body cam. at 1:28–30.) Hawpe testified that he was not sure where Holmes' right hand was while the two were on the ground but he felt someone touch his gun, which was holstered on his right hip. (Doc. 232-4 at 121:7–10; 122:15–17.) Hawpe further testified that he thought his gun was being pulled out of the holster. (*Id.* at 122:18–24.) Hawpe then yelled "watch my gun." (*Id.* at 126:22–24.) A view from another officer's body camera video shows Hawpe rolling back or being rolled towards his left side and Holmes and Hawpe then appear to be facing each other on the ground. (Doc. 259, Exh. 3, Gayer body cam. at

---

[8] Plaintiff objects to this characterization and asserts that the video controverts this evidence. The video evidence, however, does not contradict this statement. The video supports Somers' perception because it shows that Hawpe and Holmes are on the ground with their arms around each other and struggling.

0:27–28.)  Somers heard Hawpe say "watch my gun."  (Doc. 232-3 at 195:10–14.)[9]  Somers removed his right hand from Holmes' left arm as Holmes and Hawpe appear to shift, and then Hawpe again said "watch my gun."  (Gayer body cam. at 0:29.)  Somers was facing toward and standing directly over Hawpe and Holmes.  At that time, Hawpe's right side appears to be directly below Somers.  (*Id.*)  After the second time that Hawpe said "watch my gun," the video shows that Somers reached with his right hand to draw his weapon.  (*Id.*)  Somers then asked "he's going for your gun?"  (Doc. 232-3 at 127:24–128:4[10]; Hawpe's body cam. at 3:06-07.)  Almost simultaneously, someone yelled "I got it."  (Hawpe's body cam. at 3:06-07.)  That individual then yelled "I got it" two more times.  (*Id.* at 3:07–08.)  Somers testified that it was not him or Hawpe who yelled "I got it."  (*Id.* at 128:5–6.)  Viewing the evidence in a light most favorable to Plaintiff, however, it is disputed whether Somers heard the unknown individual say "I got it" at the time of the incident.  Hawpe did not know who said it although he testified that he believed that Holmes made the statement.[11]  (Doc. 232-4 at 126:25–127:3.)  Somers then discharged his firearm into Holmes' back.  At least one other officer closed in right after Somers asked about Hawpe's gun and the video shows an officer hitting Holmes with the butt-end of a shotgun almost simultaneously with Somers' discharge of his firearm.  (Docs. 255 at 12; 268 at 5; Gayer body cam. at 0:30–32.)  At the time Somers discharged his firearm, Somers testified that he could not see Holmes' hands after doing a quick scan and that he "didn't see anything that led [him] to

---

[9] Somers also set forth in his statement of facts that he heard Hawpe say "he's got my gun."  (Doc. 232 at 7.)  Plaintiff asserts this fact is controverted because the video evidence only supports a finding that Hawpe said "watch my gun" and Somers' deposition testimony admits that he might have been mistaken.  (Doc. 265 at 25.)  Somers has conceded that this "paraphrase" was inaccurate.  (Doc. 269 at 14.)

[10] Somers testified that he asked Hawpe, "He's got your gun?"  (Doc. 232-3 at 128:1.)  The video evidence supports a finding that the question was "He's going for your gun?"  (Hawpe's body cam. at 3:06–07) (*see* Doc. 232 at 8; 265 at 26.)

[11] Hawpe testified that at the time it sounded like someone said "he's got it," but the video evidence confirms that someone said "I got it."  (Doc. 232-4 at 126:24–127:3; Hawpe's body cam. at 3:06–07.)

believe that his hands were not out from controlling this weapon that was possibly in play."[12] (Doc. 259-1 at 263:12–22.)  Somers testified that he did not see Holmes' hands touch Hawpe's firearm nor did he see his hands near Hawpe's holster.  (Doc. 259-1 at 213:16–19.)  Officer Sontag who was close to Holmes' legs testified that he could not see Holmes' hands at the time Hawpe yelled out the warnings.  (Doc. 232-7 at 82:8–11.)

The video evidence as to the exact location of Holmes' hands at the time of the shooting is not clear.  After review of all of the videos submitted, it is beyond reasonable dispute that Holmes still had his left arm wrapped around the back of Hawpe at the time of the shooting.  Hawpe and Holmes appear to be facing each other on their sides and they are clearly engaged in a struggle. The videos do not support an inference that Holmes was submitting to an arrest, rather he continued to have his left arm around Hawpe in what can be described as a bear hug.  Although Somers is positioned above Hawpe's right side, the video evidence does not support an inference that Hawpe's weapon was visible from Somers' position.  In at least one video, it appears that Holmes' left arm or elbow is positioned in the direct vicinity of Hawpe's weapon which would support Somers' position that he could not see the weapon.  (Doc. 259-2, Hulse dash cam. at 3:10-15; 255 at 11; 259-1 at 128:17–22; 268 at 4.)  Plaintiff admits that Holmes' left elbow was near Hawpe's firearm.  (Doc. 268 at 4.)  Although Plaintiff asserts that Holmes' right hand was pinned under his body and not able to reach Hawpe's weapon, the video evidence does not clearly indicate where Holmes' right arm or hand was positioned at the time of the shooting.

---

[12] Plaintiff attempts to controvert this statement of fact by stating that Somers did "nothing to confirm if Matt had a gun." (Doc. 265 at 7.)  In support of this statement, Plaintiff cites to Somers' deposition testimony.  In that testimony, Somers was asked "did you do anything during that four seconds to confirm whether or not Matt had a gun?"  (Doc. 259-1 at 156:11–12.)  Somers testified that he "didn't, no." (*Id.* at 156:13.)  However, Somers had previously testified that he could not see Holmes' hands at the time.  (*Id.* at 129:18–24.)  Somers further testified that he had done a scan and could not see Holmes' hands.  (*Id.* at 263:12–22.)  Somers' testimony that he "didn't" do anything to check for a weapon does not contradict his prior testimony that he could not see Holmes' hands and that he tried to look for his hands.

It was less than four seconds from the time Hawpe yelled "watch my gun" the first time and Somers firing his weapon. (Somers' body cam. at 1:29–33.) Somers testified that at the time he shot Holmes, he believed that Holmes was actively resisting arrest, trying to overpower Hawpe, and trying to obtain Hawpe's weapon. (Doc. 232-3 at 216:9–16.) Somers believed that Holmes presented an imminent threat of death or great bodily harm to Hawpe. (Doc. 232-6 at 6.) Somers further stated that he believed that shooting Holmes was the only way to stop Holmes from harming Hawpe. (*Id.*) Several seconds after shooting Holmes, Somers stated "he was going for your gun," and then he asked Hawpe, "Did he get your gun, man?" (Docs. 259-1 at 157:11–16; 265 at 14; 269 at 9.) Somers then handcuffed Holmes. Holmes died at the scene from the gunshot wound. Holmes did not have a weapon on his person at the time he was shot.

The parties have now filed cross motions for summary judgment. Defendant seeks summary judgment on the basis that he is entitled to qualified immunity. Plaintiff asserts that she is entitled to summary judgment on the basis that the undisputed facts support a finding that Holmes' right to be free from excessive force was violated. Both parties seek to exclude expert opinions regarding the use of force. The court will address the arguments in turn.

## II.  Standard

### A.  Summary Judgment.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphases in original). "A fact is material if, under the governing law, it could have an

effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quotation marks omitted).

The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party meets its burden, the nonmoving party "must do more than refer to allegations of counsel contained in a brief to withstand summary judgment. Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotation marks omitted).  *See Redd v. City of Oklahoma City*, No. 20-6145, 2021 WL 3909982, at *3 (10th Cir. Sept. 1, 2021).  Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefore in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

**B.  Fourth Amendment**.

The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures, shall be violated…."  U.S. Const. amend. IV. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)).  "The objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

11

Amendment interests against the countervailing governmental interests at stake,'" and requires analyzing the totality of the circumstances. *Id.* (quoting *Graham,* 490 U.S. at 396). The question is analyzed "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 775 (citation omitted.) "We thus 'allo[w] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Id.* (citation omitted.)

The reasonableness test requires consideration of the particulars of each case, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Simpson v. Little,* 16 F.4th 1353, 1360–61 (10th Cir. 2021) (quoting *Graham*, 490 U.S. at 396). The second *Graham* factor is "undoubtedly the most important and fact intensive." *Id.* at 1361 (quoting *Pauly v. White,* 874 F.3d 1197, 1216 (10th Cir. 2017)).

The use of "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009) (citing, *e.g., Graham*, 490 U.S. at 396), *cert. denied*, 558 U.S. 1152 (2010). To assess the seriousness of a threat posed by the suspect under the second *Graham* factor, the court is to consider the four nonexclusive factors set forth in *Estate of Larsen*: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" *Simpson*, 16 F.4th at 1361 (citing *Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1260 (10th Cir. 2008)).

**C. Qualified Immunity**.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1058 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted)).  Qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The facts are viewed in Plaintiff's favor, as the non-movant, but "[a]t this stage, the plaintiff's version of the facts must have support in the record."  *Lehman v. McKinnon*, No. 20-1312, 2021 WL 4129229, at *2 (10th Cir. Sept. 10, 2021) (citing *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)).

For purposes of qualified immunity, the law is clearly established if Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, would put a reasonable officer on notice that he was violating the Fourth Amendment.  *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017).  While there need not be a case exactly on point, existing caselaw must have placed the constitutional issue "beyond debate."  *Soza*, 13 F.4th at 1099 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) and *White v. Pauly*, 580 U.S. 73, 79 (2017)).  In other words, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official

would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 11 (citation omitted).

Courts are not to define "clearly established" law at a high level of generality. *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.")   "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix,* 577 U.S. at 12 (emphasis in original) (citation omitted.)   "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id*. (alteration in original) (quoting *Saucier,* 533 U.S. at 205).  *See Reavis estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020).   "The relevant, dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202 (2001) (citation omitted).

Plaintiff argues that the sliding scale approach is applicable here.  In that approach, when there is not authority with "remarkably similar facts," the court looks to a "sliding scale analysis to determine whether clearly established law prohibited an officer's conduct." *Contreras on behalf of A.L. v. Dona Ana Cnty. Bd. of Cnty. Comm's*, 965 F.3d 1114, 1123 (10th Cir. 2020) (Carson, J., concurring in part and concurring in the judgment) (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). "Under the sliding scale, the worse the conduct given prevailing constitutional principles, the less specificity is required from prior caselaw to clearly establish the violation." *Id.* (citing *Casey*, 509 F.3d at 1284)  Recently, however, the Tenth Circuit has noted that the sliding scale approach "may conflict with current Supreme Court authority" because it may allow the court to find a "clearly established right even when a precedent is neither on point

nor obviously applicable." *Id.* (quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017)); *see also Luchetti v. New Mexico State Pers. Bd.*, No. 21-2109, 2022 WL 2678826, at *4 (10th Cir. July 12, 2022).  Further, recent jurisprudence shows the Tenth Circuit shifting away from the sliding scale approach and considering whether a prior decision, although not involving materially similar conduct, applies with "obvious clarity" or involves flagrantly unlawful conduct. *See Shepherd v. Robbins*, 55 F.4th 810, 818, n. 5 (10th Cir. 2022); *Hodge v. Bartram*, No. 21-2125, 2023 WL 1462746, at *3 (10th Cir. Feb. 2, 2023).

## III.    Analysis

Plaintiff asserts that Somers' use of deadly force was not objectively reasonable because no reasonable officer in his position "would have probable cause to believe that Matt posed a risk of substantial harm to anyone." (Doc. 239 at 21.)  Further, Plaintiff argues that Somers' actions escalated the situation and caused the conditions which resulted in the use of force.  (*Id.* at 27; Doc. 265 at 44.)  The amended complaint alleges that Somers' actions violated Holmes' rights under the Fourth and Fourteenth Amendments to be free from excessive force.  (Doc. 171 at 9–10.)  Somers argues he is entitled to summary judgment under the defense of qualified immunity, because the use of force was objectively reasonable under the circumstances such that it did not violate the Fourth Amendment, and because his conduct did not violate clearly established constitutional rights of which a reasonable officer would have known.  (Doc. 232.)

The court has discretion in deciding the order in which the two prongs of qualified immunity are addressed and, when appropriate, it does not need to address both parts of the test. *Soza*, 13 F.4th at 1099 (citing *Pearson*, 555 U.S. at 236–37).  Here, the court determines that Somers is entitled to summary judgment under both parts of the qualified immunity test.  In light of the standards set forth herein, the decisive question is whether Somers was reasonable in

believing that Holmes was attempting to gain possession of Hawpe's gun and fire it at Hawpe or other officers.  The court concludes that this belief was reasonable.  Further, the court finds that qualified immunity is appropriate because it was not clearly established that using deadly force in these circumstances was a violation of the Fourth Amendment.

### A.    Application of the Factors to Somers' actions

1.  Severity of the crime at issue.  The first *Graham* factor is the severity of the crime at issue.  *Graham*, 490 U.S. at 396.  Plaintiff argues that Holmes' alleged burglary and flight from officers did not warrant deadly force and was not sufficiently serious.[13]  (Doc. 265 at 40-41.) Plaintiff does not address whether the crimes at issue are misdemeanors or felonies.  The uncontroverted facts, however, show that at the time of the challenged use of force, Somers and the other law enforcement officers had probable cause to believe Holmes committed the felony offense of burglary and felony fleeing and eluding.  Kansas law provides that burglary is entering into a vehicle, without authority, with the intent to commit a theft.  K.S.A. 21-5807(a)(3).  There is no dispute that the officers believed that the individuals in Holmes' vehicle were involved in burglarizing a vehicle.  Burglary is a felony in Kansas.  K.S.A. 21-5807(c).  Further, Kansas law provides that felony fleeing and eluding is the willful attempt to elude capture for the commission of a felony by knowingly failing or refusing to stop when given a visual or audible signal to bring the vehicle to a stop.  K.S.A. 8-1568(b)(2) and (c)(2).

Moreover, as this court has recently observed, engaging in a high-speed vehicle flight presented an extremely serious threat to public safety and to the officers.  *See Hansen v. Dailey*, No. 20-2480-JWB, 2021 WL 5493058, at *11 (D. Kan. Nov. 23, 2021) (citing *Scott v. Harris*, 550

---

[13] Plaintiff summarily argues that there is no evidence that "a burglary ever happened."  (Doc. 265 at 41.)  The undisputed facts, however, support a finding that there was a report of a vehicle burglary and the suspect vehicle matched the description of Holmes' vehicle.

U.S. at 379-80 (2007) (video of police chase showed the suspect's vehicle "run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only-lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up."))  The video evidence details the seriousness of the incident which involved a high speed chase on the interstate.  Moreover, Holmes continued to drive with an incapacitated vehicle on the highway for several minutes after driving over the stop sticks.  Holmes presented a danger to the other drivers that were traveling on the highway and to the officers.

Plaintiff argues that the crimes at issue were not sufficiently serious for this factor to weigh in favor of a finding of reasonableness citing to *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006).  Plaintiff quotes the Tenth Circuit as holding that the crimes at issue "(theft of the vehicle, eluding the officers) were not particularly severe."  (Doc. 265 at 40–41.)  In *Walker*, however, the Tenth Circuit does not specifically discuss whether the crimes were misdemeanors or felonies under the law and does not detail its findings on this factor.  This statement, without any context, is not sufficient to support the conclusion that the crimes here are not severe.  Notably, the Tenth Circuit recently reaffirmed that its "binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent."  *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

Therefore, because the undisputed facts support a finding that the crimes at issue were felonies under Kansas law, this factor weighs against Plaintiff.

2.  Whether the suspect poses an immediate threat to the safety of the officers or others.

The second *Graham* factor – the "most important and fact intensive" – is whether the suspect poses an immediate threat to the safety of the officers or anyone else at the moment the

force was used.  *Id.* (quoting *Graham*, 490 U.S. at 396).  In assessing the degree of threat, the court considers the *Estate of Larsen* factors discussed *supra*.  *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1314–15 (10th Cir. 2009).  An important aspect is "whether the officers were in danger at the precise moment that they used force."  *Id.* at 1315 (quoting *Phillips*, 422 F.3d at 1083).  "Furthermore, a reasonable but mistaken belief that the suspect is likely to fight back justifies using more force than is actually needed."  *Id.* (quoting *Estate of Larsen*, 511 F.3d at 1260).  Plaintiff limits her claim to the argument that deadly force was unconstitutionally used when Somers shot Holmes.

i. Order to drop weapon.  The first *Estate of Larsen* factor examines "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands." *Estate of Larsen*, 511 F.3d at 1260.  Here, viewing the facts in a light most favorable to Plaintiff, Holmes was unarmed when Somers shot him.  The facts further show that Holmes never possessed a weapon on that night.  Because of these facts, Plaintiff argues that this factor weighs in her favor. However, the Tenth Circuit has held that in such a circumstance, the court considers whether Holmes was complying with the officers' commands.  *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 766 (10th Cir. 2021), *cert. denied sub nom. Est. of Dillon Taylor v. Salt Lake City, Utah*, 143 S. Ct. 83 (2022).  When a "suspect is not holding a gun when the confrontation begins, officers can do little more than what they did in this case: order the suspect to raise his hands and get to the ground."  *Id.* (citation omitted) (finding that this factor weighed in favor of the defendants because the suspect refused to comply with commands throughout the entire encounter).

Somers contends that Holmes was not complying with the commands to get on the ground and get out of the car and that he was given a prior warning that he would be shot.  Plaintiff contends that Holmes did comply by getting out of the car and that Holmes could not comply with

the order to get on the ground because Somers also yelled "come over."  The undisputed facts in this case show that the officers gave repeated and continuous commands to Holmes while he was in the car and after he got out of the car.  While Holmes periodically complied with the commands to raise his hands, he also repeatedly lowered his hands.  Moreover, during this time he was yelling at the officers.  When he finally exited the car, he did so with his hands down by his sides; again, failing to comply with the commands to raise his hands.  During this time, Holmes was yelling at officers to "shoot" him.  The officers can be heard telling Holmes to get down on the ground at least five times.  Although Somers can be heard saying "come here" on one occasion, there is no evidence that this single "come here" caused Holmes to be confused and unable to determine what the officers wanted him to do.[14]  Rather, the video evidence shows that Holmes was being defiant and continuing to verbally challenge the officers by telling them to shoot him while the officers were yelling for him to get down multiple times.  *See Estate of Taylor*, 16 F.4th at 750.  Moreover, Holmes made no attempt to get on the ground.  After the ineffective use of the taser, bean bags, and the K-9, Holmes was twice instructed to get down on the ground.  Holmes remained defiant, making no attempt to comply.  Although the events transpired rapidly, the video does not depict an individual who was going to "surrender" or who was "confused" by the officers' commands as argued by Plaintiff.  (Doc. 265 at 31.)

Therefore, this factor weighs in favor of Defendant.

ii.  Hostile motions.  The second factor under *Estate of Larsen* is "whether any hostile motions were made with the weapon towards the officers."  511 F.3d at 1260.  Again, Plaintiff asserts that the uncontroverted evidence is that Holmes did not possess a firearm and therefore this

---

[14] Although Plaintiff's expert states in his report that this command was confusing, Plaintiff's expert offers nothing in support of his opinion that Holmes was confused.  (Doc. 259-21 at 16.)  In any event, the evidence does not support such an inference.

factor weighs in her favor.  Plaintiff further asserts that Holmes "made no hostile motions at all" while he was on the ground.  (Doc. 265 at 30.)  The court disagrees with Plaintiff's assertion that Holmes made no hostile motions.  However, the court finds that this factor is not applicable given the undisputed fact that Holmes did not obtain Hawpe's weapon and because the court addresses the facts relating to the struggle with Hawpe on the ground and the perceived threat involving Hawpe's weapon under the other factors.

 iii.  <u>Distance</u>.  The third factor under *Estate of Larsen* is "the distance separating the officers and the suspect."  *Estate of Larsen,* 511 F.3d at 1260.  Plaintiff argues that the "distance between Matt and the officers was minimal, which cuts against Somers."  (Doc. 265 at 31.)  Plaintiff, however, fails to cite any authority for that proposition.  Contrary to Plaintiff's assertion, the close distance weighs in favor of a finding of an imminent threat to Hawpe.  Holmes and Hawpe were struggling on the ground and Holmes made no discernible effort to cease his resistance.  This short distance heightens the danger to Hawpe especially because he would be in imminent danger should Holmes obtain Hawpe's weapon.  *Est. of Taylor*, 16 F.4th at 769–70 ("The short distance separating Mr. Taylor and Officer Cruz, compounded by the absence of immediately accessible cover that Officer Cruz could use to avoid potential harm, causes this third factor to weigh in Defendants' favor.")

 Therefore, this factor weighs in favor of finding that Holmes posed an immediate threat to Hawpe.

 iv.  <u>Manifest intentions</u>.  The fourth *Estate of Larsen* factor is "the manifest intentions of the suspect."  *Estate of Larsen,* 511 F.3d at 1260.  In evaluating Holmes' manifest intentions, the court looks to whether a reasonable officer on the scene would have perceived Holmes' actions as threatening.  *See Est. of Taylor*, 16 F.4th at 770.  Importantly, the officer's assessment of a threat

"need not be correct...as long as it is reasonable." *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015).  The use of deadly force is reasonable when the officers are faced with a threat of serious physical harm; however, that "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death." *Cordova*, 569 F.3d at 1190.

Here, Somers argues that a reasonable officer would have perceived Holmes' actions as threatening and an attempt to gain possession of Hawpe's firearm because Holmes was resisting arrest, was engaged in a physical struggle with Hawpe on the ground, Hawpe yelled a warning about his weapon, and Somers was unable to see both of Holmes' hands and the weapon.  In response, Plaintiff argues that Holmes' intention was to surrender, he did not make any aggressive moves, and he did not intend to gain possession of Hawpe's firearm.  (Doc. 265 at 31.)

The evidence does not support Plaintiff's assertion that Holmes intended to surrender. Rather, he continually evidenced hostility towards officers throughout the interaction including when he refused to be taken into custody by Hawpe.  Indeed, the evidence shows that Holmes took extraordinary actions to avoid being taken into custody.  Holmes attempted to avoid capture by travelling at excessive speeds on the highway and then driving for several minutes with flat tires. Holmes then refused to get out of the vehicle after being surrounded by multiple law enforcement officers.  Rather, Holmes continued to ignore their commands and smoke his cigarette.  Holmes was yelling at the officers at this time and telling them to shoot him.  Holmes then continued to ignore officer commands and engaged in a physical altercation with Hawpe when Hawpe attempted to take him into custody.

Plaintiff argues that Holmes did not make any aggressive moves because there was no evidence that Holmes tried to hit Hawpe during the struggle.  The evidence, including the video,

however, shows Holmes engaging in a physical struggle on the ground with Hawpe.  There is no evidence that Holmes was surrendering to Hawpe.  Based on the video and the officers' testimony, a reasonable officer would view Holmes' conduct during the altercation as trying to overpower Hawpe.  Plaintiff further argues that Holmes did not intend to harm Hawpe with a weapon because the evidence supports a finding that Holmes did not reach for the weapon during the struggle with Hawpe.  While officers have testified that they did not see Holmes reach for the weapon, that fact alone does not negate the remaining facts and circumstances confronting the officers.   In determining Holmes' manifest intent, the question is whether a reasonable officer would perceive Holmes' actions as threatening.  Here, Somers was confronted with a suspect who had allegedly committed burglary and felony fleeing and eluding.  This suspect engaged in extensive conduct in an attempt to avoid capture.   After stopping the vehicle, Holmes continued to ignore police commands to surrender, taunted officers by telling them to shoot him, and then engaged in a physical altercation with the arresting officer.  Further, it was dark outside and Somers could not see Holmes' right hand.  Finally, Hawpe yelled out a warning about his gun which Somers clearly perceived was a warning that Holmes was attempting to take Hawpe's gun.  Notably, another officer also approached immediately after Hawpe's warning and hit Holmes with the butt of his shotgun.  This conduct would support an inference that another officer believed that the use of force, even potential deadly force given the weapon used and force applied, was necessary.  At the time Hawpe yelled the warning during the struggle, Holmes' left arm/hand was in close proximity to Hawpe's weapon as his left elbow/arm appears to be directly over Hawpe's right hip in the video.  Based on the position of his left arm, Holmes was in a position to be able to quickly reach for Hawpe's firearm.

These events occurred under circumstances that were "tense, uncertain, and rapidly evolving" which required Somers to make a "split-second judgment[]" about the need for deadly force. *Pauly*, 874 F.3d at 1215. The court must consider the facts from the perspective of a reasonable officer on the scene and not with "20/20 vision of hindsight." *Id.* Viewing the facts and drawing inferences in Plaintiff's favor, the court concludes that it was reasonable for Somers to believe that Holmes was trying to overpower Hawpe and obtain his weapon to use it against the officers, thus justifying the use of deadly force. Holmes continually ignored commands from officers, verbally challenged them by suggesting that the only way they would get compliance was for them to shoot him, and then he engaged in a physical altercation with Hawpe on the ground during which Somers could not see Holmes' right hand and Holmes' left arm was over Hawpe's weapon. Even if Somers' "*subjective* intentions" were "harmless—his *manifest* intentions were hostile and malevolent." *Taylor*, 16 F.4th at 771 (emphasis in original).

Viewing the facts in a light most favorable to Plaintiff, the court finds that this factor weighs in favor of Somers.

v.     <u>Summation of the Second *Graham* Factor</u>

After review, the *Estate of Larson* factors weigh in favor of Somers. These factors are not the dispositive determination, but are only aids in making the ultimate finding "which is whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Tenorio*, 802 F.3d at 1164. After review of the totality of the circumstances, as discussed *infra*, the court finds that at the time of the shooting, the use of force was reasonable.

<u>3.  Whether the suspect is actively resisting arrest or attempting to evade arrest by flight</u>.

The third and final *Graham* factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. This factor is evaluated by

considering whether Holmes was "fleeing or actively resisting at the 'precise moment' the officer employed the challenged used of force." *See Vette*, 989 F.3d at 1171. This factor weighs strongly in favor of a finding that Somers' use of force was reasonable. The uncontroverted facts show that Holmes was actively resisting arrest at the time of the seizure.

Although Plaintiff cites *Vette* for the standard, she proceeds to argue facts related to events prior to the struggle on the ground. (Doc. 265 at 31-33.) The testimony of both Somers and Hawpe was that Holmes was actively fighting with Hawpe. (Doc. 259-9 at 116:24-120:18; 259-1 at 124:16-125:5.) Contrary to Plaintiff's assertion, the video supports this testimony. Although there is no evidence that Holmes was striking Hawpe, the video shows Holmes wrap his arms around Hawpe after Hawpe attempts to place Holmes in a neck hold. The video further shows the two roll on the ground during the struggle with Holmes continuing to have his left arm wrapped around Hawpe. At no point does Holmes give any indication that he is submitting to Hawpe during this struggle. No reasonable jury could conclude that Holmes was not actively resisting arrest from the moment Hawpe first tried to seize Holmes until Somers fired his weapon. *See Edwards v. City of Muskogee, Okla.*, 841 F. App'x 79, 84–85 (10th Cir.), *cert. denied sub nom. Edwards v. Harmon*, 142 S. Ct. 98 (2021) (finding that the plaintiff's active struggle with officers when they attempted to place him under arrest weighed against the plaintiff).

Moreover, contrary to Plaintiff's arguments, the events leading up to the seizure further support a reasonable belief that Holmes was not going to submit to the officers. Holmes went to incredible lengths to avoid being seized by the officers including fleeing at speeds of over one hundred miles per hour, driving over spike strips, and continuing to drive for several minutes after the vehicle's tires were flat. Then, after his vehicle was unable to travel anymore, Holmes remained in his vehicle for almost three minutes. During this time, Holmes was yelling at the

officers, including yelling obscenities, and failing to comply with their repeated commands to get out of the vehicle. Holmes was also seen disregarding commands to put his hands up and officers were concerned about Holmes' right hand not being visible to the officers. While Holmes ultimately complied with the command to get out of the vehicle, he did not give any indication that he was going to submit to authority after he did so.

This factor weighs heavily in favor of a finding that the force used was objectively reasonable.

4.    Somers' conduct

Although the court has considered all of the *Graham* factors, this does not end the inquiry. In evaluating the totality of the circumstances, the reasonableness of the use of force also depends on "whether the officer['s] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Valverde*, 967 F.3d at 1067. The Tenth Circuit has previously held that "officers violated the Fourth Amendment whe[n] they recklessly confronted armed and impaired individuals, creating the need for the use of deadly force." *Taylor*, 16 F.4th at 771 (citation omitted). However, officers' actions that are merely negligent are not actionable under § 1983. *Id.*

Plaintiff argues that Somers was the aggressor, was in the mood for a fight, and that he violated MCSO policy by joining the car chase. Plaintiff further argues that Somers escalated the situation by yelling that he was going to shoot Holmes, giving a conflicting command, telling Achilles to hit Holmes with beanbags, and utilizing his taser. Plaintiff fails to cite any authority in support of her position that these actions recklessly created the need for force. Rather, Plaintiff generally cites to the law regarding reckless conduct. This is insufficient. *Valverde*, 967 F.3d at 1067.

Moreover, although Plaintiff conclusively suggests that no de-escalation techniques were used, the evidence is that officers gave verbal commands to Holmes for at least two minutes.  (Doc. 265 at 9.)  After Holmes exited the car and did not comply with commands to get down, the officers used non-lethal methods in an attempt to gain Holmes' compliance.  Although the officers could have continued to attempt to obtain compliance by yelling commands at Holmes, Plaintiff fails to cite to any authority that their use of the taser and bean bags recklessly escalated the situation given Holmes conduct prior to the use of these methods.  Notably, the situation was not in control at the time that Holmes stepped out of the car.  Although Plaintiff cages this action as compliant, Holmes continued to ignore officer commands by not getting on the ground and failing to raise his hands.  Further, the passenger also remained in the vehicle at this point presenting another potential risk to the officers.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has not shown that Somers acted recklessly by "approach[ing] the situation in a manner [he] knew or should have known would result in escalation of the danger."  *Bond v. City of Tahlequah, Okla.,* 981 F.3d 808, 816 (10th Cir. 2020) (citations omitted), *reversed on other grounds by Bond*, 142 S. Ct. 9.

5.  Conclusion.

This is a tragic case.  However, considering the totality of the circumstances, the court concludes that Somers' use of deadly force in these circumstances was reasonable.  The use of "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others."  *Cordova*, 569 F.3d at 1192.  This case involved an individual who was suspected of a felony, engaged in a high speed vehicle chase and disregarded the safety of the public while doing so, and continued to ignore repeated commands by law enforcement.  Holmes also was verbally

noncompliant by yelling at the officers and telling them to shoot him.  Holmes, as shown in the video, objectively appeared willing to go to great lengths to avoid apprehension even in the face of multiple non-lethal means of seizure.  Although Holmes did not have a weapon, he engaged in a physical altercation with Hawpe on the ground instead of complying with commands and surrendering to the officers.  During that altercation, Somers attempted to restrain Holmes and did, for a short time, restrain Holmes' left arm.  Holmes and Hawpe shifted, however, resulting in Somers moving to a different position.  Hawpe then yelled out the warning about his weapon twice after feeling someone make contact with his gun.  As evidenced by his response asking if Holmes was going for Hawpe's gun, Somers reasonably believed the warning was due to Holmes grabbing Hawpe's weapon or trying to gain control of the weapon.  Another officer also approached due to the warning and moved to strike Holmes with the butt of his shotgun.  Somers could not see Hawpe's weapon and could not see Holmes' right hand, although a jury could find that Somers could see that Holmes' left hand was on Hawpe's back.  Holmes' left arm/hand was in close proximity to Hawpe's weapon as his left elbow/arm appears to be directly over Hawpe's right hip. Based on the position of his left arm, Holmes was in a position to be able to quickly reach for Hawpe's firearm.

These events all transpired rapidly, resulting in Somers making a quick decision to use deadly force.  From the facts confronting him, the court finds that Somers had probable cause to believe Hawpe was in serious danger.  While the reasonableness of the use of deadly force depends in part on whether officers "were in danger at the precise moment that they used force" (*Vette*, 989 F.3d at 1170), "[t]he calculus of reasonableness must embody allowance for the fact that police officers are forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."

*Graham*, 490 U.S. at 396-97.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  In hindsight, it may be that Somers could have been able to restrain Holmes' left hand and then, with assistance of other officers, restrain his right hand.  But a reasonable officer in Somers' position could not have been sure of that outcome under the circumstances and in the limited time he had to make the decision on using force.  *See Tenorio*, 802 F.3d at 1164 ("A reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions.") (citation omitted).

The court finds that the uncontroverted facts show that at the time of the shooting, a reasonable officer in Somers' position would have had probable cause to believe that Holmes posed a significant threat of serious physical harm to Hawpe.

## B.      Qualified Immunity

Even if Somers' actions could be found to be a violation of Holmes' rights under the Fourth Amendment, Plaintiff has not shown that his actions violated clearly established law (even under the sliding scale or obvious clarity approach).  As such, Somers is entitled to summary judgment under the second part of the qualified immunity test, which places the burden on Plaintiff to show that the law was clearly established at the time of the alleged violation.  *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).  Plaintiff argues that the law was clearly established at the time of the shooting that an officer may not use deadly force on a suspect who is unarmed and not a threat.[15]  In response, Somers argues that Plaintiff has relied on a general statement of the law which is not sufficient to put Somers on notice that his conduct violated Holmes' rights.

---

[15] Plaintiff also makes the argument that "it is clearly established that lethal force may be used only when an officer or another person is threatened with a weapon, not just in the presence of one that could potentially be used."  (Doc. 265 at 44.)  Plaintiff appears to argue that it is clearly established that an officer cannot use deadly force unless the suspect has a weapon.  Plaintiff fails to cite applicable authority for this proposition and it is not the law in the Tenth

In support of her argument that the law was clearly established, Plaintiff cites generally to the law but makes no attempt to show that the cases cited involve similar facts.  (Doc. 265 at 42–43.)  Without expressing as much, Plaintiff apparently concedes that no precedent from the Supreme Court or the Tenth Circuit involves facts "materially similar" to those in this case.  *See Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (*Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016)); *Hodge v. Bartram*, 2023 WL 1462746 *3 (10th Cir. Feb. 2, 2023); *Mullenix*, 577 U.S. at 12.  Plaintiff argues that general precedent applies with obvious clarity in this case because Somers' conduct was particularly egregious.  Plaintiff cites to several general statements of the law, i.e. "an officer may use deadly force only if a reasonable officer in his position would have had probable cause to believe there was a threat of serious physical harm to himself or others," and "fatally shooting an unarmed, non-dangerous person is excessive force," in support of her position that Somers' conduct was unlawful in light of *Garner* and *Graham*.  (Doc. 265 at 37.)  The Supreme Court has held that *Garner* and *Graham's* general standards can, in an obvious case, provide sufficient notice to an officer that his conduct is unlawful.  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).  Plaintiff, however, fails to articulate how the facts in this case rise to such an egregious violation as to be obvious under *Graham*.  Those cases are rare and typically involve a "use of force that is *unquestionably* excessive."  *Hodge*, 2023 WL 1462746, at *4 (emphasis supplied).  As discussed herein, the court determined that the *Graham* factors weighed in favor of Somers.  To find an obvious violation based on *Graham*, a court must conclude that the factors weighed so heavily in Plaintiff's favor as to render Somers' use of deadly force "inarguably excessive."  *Id.*  Based on a review of the factors as discussed herein, the court

---

Circuit.  *See Blossom v. Yarbrough*, 429 F.3d 963, 967–68 (10th Cir. 2005) ("We have previously rejected the argument that only a suspect armed with a deadly weapon poses a physical threat sufficient to justify use of deadly force.") (citing *Ryder v. City of Topeka*, 814 F.2d 1412, 1419 n. 16 (10th Cir. 1987)).

does not find that Somers' use of deadly force was inarguably excessive such that the general precedent under *Garner* and *Graham* apply here.

Plaintiff further cites to *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) for the proposition that it is "well beyond settled that fatally shooting an unarmed, non-dangerous person is excessive force." (Doc. 265 at 43.) In *Walker*, police officers responded to a call of a suicidal individual who was possibly "en route to cause harm to his family." 451 F.3d at 1157. When officers arrived, the suspect was holding a box cutter to his wrist. The court found that the suspect "did not pose an immediate threat to the safety of the officers or others. He had made no threats and was not advancing on anyone with the small knife." *Id.* at 1160. An officer shot the suspect and a second officer shot two more rounds. One officer claimed that he thought the knife was actually a gun, but the facts supported a finding that the "angle of [the individual's] hands and the amount of light on the scene should have permitted [the officer] to ascertain that [the individual] was not holding a gun in a shooting stance." *Id.* at 1160. The Tenth Circuit affirmed the denial of qualified immunity, holding that it was "specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect." *Id.*

The material facts in *Walker* are not sufficiently similar to the facts in this case. Here, Holmes had been failing to comply with officer demands, urging the officers to shoot him, had been unphased by prior uses of non-lethal force, and was actively struggling on the ground with Hawpe. Unlike *Walker*, Holmes was actively engaged in a physical altercation with an officer who was attempting to place him under arrest. Moreover, Hawpe yelled out a concern about his firearm during the altercation after he felt what he believed to be Holmes' attempt to grab his

firearm.  Although Plaintiff urges the court to find that Holmes never reached for the firearm, the video evidence is unclear and it is difficult to determine whether Holmes jostled the firearm as discussed *infra*.  Further, Somers was unable to see Holmes' right hand at the time of the shooting and the video appears to show that Holmes' left arm was directly above or on Hawpe's firearm. The facts in *Walker* are not sufficiently similar to put Somers on notice that his conduct violated Holmes' rights.

Next, Plaintiff cites to *King v. Hill*, 615 F. App'x 470 (10th Cir. 2015) for the proposition that an officer may not shoot an unarmed suspect who did not pose a threat despite a subjective fear that the suspect was armed.  (Doc. 265 at 43.)  In that case, officers received a report during daylight hours that a man with mental illness was making threats against his spouse, although there were no known weapons in the house.  *King,* 615 F. App'x at 471.  The responding officers encountered the spouse in a neighbor's driveway who informed them the suspect had not hit or injured her.  The officers saw the suspect who was wearing a camouflage jacket, carrying another camouflage jacket over his arm, and walking or running toward his house from his yard.  One of the officers believed the man could have had a long gun under the jacket on his arm. *Id.* at 472. Another witness, however, testified that the suspect did not have anything in his hands and the hands were visible under the jacket.  An officer retrieved his rifle. Officers warned the suspect to put down whatever was in his hands and the suspect responded by telling them to get off his property and that he had enough explosives to blow up the house or "blow you-all's asses up." *Id.* There was disputed testimony concerning the man's movements.  Notably, there was testimony that the suspect did not make threatening movements and started to raise his empty hands when he was shot.  *Id.* at 472.  The court pointed out the Supreme Court had long ago held that an "officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Id.* at 477 (citing

31

*Tennessee v. Garner,* 471 U.S. 1 (1985).  The Tenth Circuit found that a reasonable jury could find that the suspect did not pose an immediate threat because his hands were visible, he did not have a weapon, he was not making any threatening motions towards the officers, and he was between 25 and 75 yards away from the officers at the time he was shot.  While *King* reinforced the clearly established law that an unarmed suspect who is not an immediate threat to others cannot be seized with deadly force, the facts in *King* are distinguishable here.  In this case, Holmes' right hand was not clearly visible to Somers, Holmes was actively resisting arrest and engaged in a physical struggle with Hawpe, and Hawpe yelled out a warning to the other officers about his firearm. Although Holmes never obtained a weapon, the evidence viewed in a light most favorable to Plaintiff does not show that Holmes was a "nondangerous" suspect.

Plaintiff further cites to several cases for general propositions; however, none of those cases support a finding that Somers' conduct violated clearly established precedent.  *See Est. of Ceballos v. Husk*, 919 F.3d 1204, 1217–18 (10th Cir. 2019) (officers shot a suspect who was mentally impaired); *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003) (denial of qualified immunity after officers shot an unarmed man in the back who was not advancing on them)[16]; *Tenorio v. Pitzer*, 802 F.3d 1160, 1164–65 (10th Cir. 2015) (upholding denial of summary judgment because the facts viewed in a light most favorable to the plaintiff could indicate that the suspect was shot while holding a knife at his side even though he made no threatening gestures, was not acting or speaking hostilely at the time of the shooting, and was not "within striking distance of" the officer); *Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014) ("Mr. Booker was handcuffed, prone on his

---

[16] Plaintiff has also cited to *Brosseau v. Haugen*, 543 U.S.194, 198 (2004) for the "same" proposition as *Carr*.  (Doc. 265 at 44.)   *Brosseau*, however, involved the question of "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (citing *Brosseau*, 543 U.S. at 199-200).   The material facts in that case are starkly different.

stomach, and not resisting while much of the disproportionate use of force occurred."); *Weigel v. Broad*, 544 F.3d 1143, 1152, 1155 (10th Cir. 2008) (holding that the defendants' alleged use of force became excessive "once Mr. Weigel was handcuffed and his legs were bound"); and *Zuchel v. City and County of Denver, Colo*., 997 F.2d 730 (10th Cir. 1993).[17]  None of these cases would place Somers on notice that his conduct violated Holmes' rights.  *See Tenorio*, 802 F.3d at 1165-66 (discussing that *Zuchel* "specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect.")

Notably, in each of the cases cited by Plaintiff, none of the suspects were actively resisting arrest at the time of the use of force.  Moreover, the authority cited does not involve a struggle between the suspect and an officer which included a warning about a firearm.  Here, Plaintiff repeatedly refused to comply with the officers' commands, engaged in a physical altercation with Hawpe, Somers was unable to see Holmes' right hand and Hawpe's firearm at the time of the shooting, and Holmes' left hand was in close proximity to Hawpe's firearm.  None of the cases cited by Plaintiff clearly establish that an officer violates the Fourth Amendment by using deadly force against a suspect who ignores officers' commands to get down, is actively hostile to officers by yelling and telling officers to "shoot," resists officers' attempts to place him under arrest, engages in a physical struggle with an officer, the officer feels his weapon being touched or pulled out and yells a warning about his gun, and the shooting officer cannot see the weapon which would be directly under the suspect's left elbow/arm nor can he see the suspect's right hand.  Plaintiff's

---

[17] Although Plaintiff cited to Zuchel's case against the county defendant after a trial, the related case, *Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989), discussed qualified immunity with respect to the officer's motion for summary judgment.  *See Zuchel*, 997 F.2d at 733.

cases simply aren't "close enough on point to make the unlawfulness of the officers' actions apparent." *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011).

In support of the argument that the law is not clearly established given the facts in this case, Somers cites to *Parks v. Pomeroy*, 387 F.3d 949 (8th Cir. 2004). In that case, officers responded to a domestic violence call in which the suspect was drunk but the wife reported that there were no weapons involved. Two officers arrived at the house and entered together. The suspect had calmed down at the time officers arrived but he refused to be taken into custody. One officer attempted to grab the suspect and the suspect "blocked" him causing the officer to stumble. *Id.* at 952. The officer regained his balance, grabbed the suspect by the throat, and sprayed the suspect with pepper spray. *Id.* The two then struggled on the floor with the suspect on top of the officer at one point. The second officer remained close by but was not engaged. The struggling officer yelled "I think he's going for my gun." *Id.* at 953. The suspect replied: "I'm not. I can't see." *Id.* The suspect's wife could see that the suspect's left hand was on the floor bracing himself and not touching the gun. The second officer fired his gun into the suspect's back. The district court found that a reasonable jury could find that the shooting officer shot the suspect even though he could see that the suspect's hand was not on the firearm and therefore he was not an immediate threat. *Id.* The district court further found that the conduct violated the suspect's clearly established Fourth Amendment rights. *Id.* at 954. On appeal, the Eighth Circuit reversed. The court discussed prior precedent holding that in tense and rapidly evolving circumstances, an officer's actions are not to be assessed with 20/20 hindsight when faced with the need to make instantaneous decisions. *Id.* at 957 (citation omitted). The Eighth Circuit held that it could not find that the shooting officer reasonably should have known that what he was doing violated the suspect's constitutional rights even if the court assumed that the shooting officer could see the suspect's left hand on the floor.

*Id.*  The evidence was that the gun was just inches from the suspect's hand, there was a hostile physical struggle between the officer and the suspect, the circumstances were extremely volatile and potentially deadly, and the events were evolving rapidly.  *Id.* at 957-58.

Although *Parks* is an Eighth Circuit decision, it is helpful here in that the material facts are sufficiently similar to this case.  In this case, Holmes was refusing to comply with officer's demands, actively resisting arrest even after being tased and shot with bean bags, and in a struggle with Hawpe.  Moreover, Hawpe yelled out a concern regarding his weapon and Somers could not visually see Holmes' right hand and Holmes left arm was covering Hawpe's right hip.  Therefore, under these intense and rapidly evolving circumstances, Somers' actions cannot be assessed with 20/20 hindsight.  At the moment of the shooting, the court cannot say that Somers reasonably should have known that his conduct violated Holmes' Fourth Amendment rights.

Plaintiff cites no established precedent that would have put Somers on notice that his use of force was unreasonable.  "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Bond*, 142 S. Ct. at 11.  None of the cases cited by Plaintiff would put a reasonable officer on notice that the conduct here was unlawful.  *Id.* ("Suffice it to say, a reasonable officer could miss the connection between that case and this one" given the factual differences in the authority.)  Further, even if the level of force used by Somers was excessive, the *Graham* factors do not decisively weigh in Plaintiff's favor as to place the unconstitutionality of Somers' conduct "beyond debate."  *Hodge*, 2023 WL 1462746, at *4. Plaintiff has thus failed to show that Somers' actions violated clearly established law.

**IV.      Conclusion**

Defendant's motion for summary judgment (Doc. 232) is GRANTED, Plaintiff's motion for summary judgment (Doc. 238) is DENIED and the motions to exclude (Docs. 233, 234) are DENIED AS MOOT.

IT IS SO ORDERED.  Dated this 27th day of February, 2023.

___s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE